IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| DAVID KENNEDY, | : |
| Plaintiff, | : |
| v. | : CASE NO.: 1:22-CV-148 (LAG) |
| DEPUTY KENNY WESTON, | : |
| Defendant. | : |

### ORDER

Before the Court is Defendant Deputy Kenny Weston's Motion for Summary Judgment (Doc. 12). For the reasons below, Defendant's Motion for Summary Judgment (Doc. 12) is **GRANTED in part** and **DENIED in part**.

### FACTUAL BACKGROUND

This case arises out of Defendant Weston's attempt to stop Plaintiff David Kennedy for a traffic violation.[1] (*See* Docs. 1, 12-1, 15-4). On September 28, 2020, Defendant, a deputy sheriff employed by Grady County, was driving a patrol vehicle north on Highway 93 in Grady County. (Doc. 12-1 ¶¶ 1–2; Doc. 15-5 ¶¶ 1–2). Plaintiff was driving a pickup truck south on the same highway. (Doc. 12-1 ¶¶ 2–3; Doc. 15-5 ¶¶ 2–3; Doc. 12-8 at 47:11–14). At 11:50 p.m., the two vehicles passed each other. (Doc. 12-1 ¶ 2; Doc. 12-8 at 47:11–14; Doc. 15-5 ¶ 2). Defendant testified that he noticed from his rearview mirror, after passing Plaintiff, that one of the taillights on the pickup truck was out. (Doc. 12-1 ¶ 4; Doc. 12-7 at 22:7–18; Doc. 15-5 ¶ 4). Defendant turned to follow Plaintiff south on Highway 93. (Doc. 12-1 ¶¶ 5–6). He initially did not turn on his emergency lights so that he could confirm that the taillight was out before stopping Plaintiff. (Doc. 12-1 ¶¶ 5–6; Doc. 12-7

---

[1]   The relevant facts are derived from the Parties' Statements of Material facts, responses thereto, and the record in this case. (*See* Docs. 12-1, 15-4, 15-5). When evaluating a Motion for Summary Judgment, the Court "view[s] the facts in the light most favorable to the plaintiff." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citation omitted); *see also* Fed. Civ. R. P. 56.

at 25:1–10; Doc. 15-5 ¶¶ 5–6). After Defendant turned around, Plaintiff turned left and began to speed up and a chase ensued. (Doc. 12-1 ¶¶ 8–11; Doc. 12-8 at 49:2–10; Doc. 15-5 ¶¶ 8–11). Defendant was not able to determine if the taillight was indeed not functioning because Plaintiff remained too far ahead during the chase. (Doc. 12-7 at 36:1–9). Plaintiff eventually turned off all of the lights on the truck. (Doc. 12-1 ¶ 9; Doc. 12-7 at 27:22–28:3; Doc. 12-8 at 49:11–17; Doc. 15-5 ¶ 9). Defendant activated the emergency lights on the patrol vehicle when the pickup truck's lights went out, and Plaintiff increased the speed of his vehicle. (Doc. 12-1 ¶¶ 10–11; Doc. 12-7 at 27:24–28:10; Doc. 12-8 at 49:6–10; Doc. 15-5 ¶¶ 10–11). Defendant pursued Plaintiff for thirty minutes across three counties. (Doc. 12-1 ¶ 20; Doc. 12-8 at 58:22–24, 59:20–60:25; Doc. 15-5 ¶ 20).

Plaintiff testified at his deposition that he understood that Defendant was trying to pull him over and "turned [his] lights off so maybe . . . [he] could try to get away from [Defendant]." (Doc. 12-8 at 49:14–16, 57:16–24). Plaintiff did not have a driver's license and had an outstanding warrant out for his arrest in Habersham County for a misdemeanor drug paraphernalia charge. (*Id.* at 53:25–55:3). Furthermore, Plaintiff was on probation and driving without a license would have been a violation of that probation. (*Id.* at 54:4–8). Plaintiff testified that he "was trying to avoid . . . the whole situation." (*Id.* at 54:5).

There is video footage, recorded by Defendant's dash camera of Plaintiff and Defendant passing one another, Defendant turning around, and the pursuit leading up to Plaintiff's arrest. (Doc. 12-1 ¶ 21; Doc. 15-5 ¶ 21; Doc. 12-4; Ex. A, Dash Camera Footage at 00:06–36:00 (on file with the Court)). During the pursuit, the dash camera footage shows Plaintiff's pickup truck crossing into the opposite lane of travel across double and dashed yellow lines several times and failing to stop at stop signs. (Doc. 12-1 ¶¶ 21–22; *see* Ex. A, Dash Camera Footage at 11:52–12:30, 15:00–29:25). The Parties agree that the pickup truck reached speeds of at least 99 miles per hour during the chase. (Doc. 12-3 ¶ 20; Doc. 12-8 at 61:5–10). The pursuit was on rural roads and at least one vehicle pulled over to avoid Plaintiff and Defendant. (Doc. 12-8 at 47:21–25, 62:20–63:5; Ex. A, Dash Camera Footage at 17:08–17:30). About twenty-nine minutes into the pursuit, Plaintiff turned left onto Mountain Olive Road, lost control of the pickup truck, and spun into a ditch. (Doc.

2

12-1 ¶¶ 23–26; Doc. 15-5 ¶¶ 23–26; *see* Ex. A, Dash Camera Footage at 29:17–29:23). When the truck came to a stop it was facing Mount Olive Road. (Doc. 12-1 ¶¶ 27–28; Doc. 15-5 ¶¶ 27–28; *see* Ex. A, Dash Camera Footage at 29:19–29:24). In the dash camera footage, as the pickup truck settled into the ditch, Plaintiff opened the door and started to get out of the truck, but then got back in and closed the door. (Ex. A, Dash Camera Footage, at 29:23–29:28).

There is body camera footage of Defendant driving into the ditch and getting out of the patrol vehicle. (Ex. B, Body Camera Footage, at 00:15–00:31(on file with the Court)). At times, the headlights of the pickup truck shine into the camera and make it difficult to see exactly what happens. (*See id.*). Defendant stopped in front of the pickup truck, with the patrol car facing the truck's passenger side; but, instead of putting the patrol car in park, he put it in neutral. (Doc. 12-1 ¶ 29; Doc. 15-5 ¶ 29; *see* Ex. B, Body Camera Footage at 00:15–00:22). After Defendant exited his vehicle, which slowly rolled into the ditch, Defendant ran around the back of the Patrol vehicle and into the ditch. (Doc. 12-1 ¶¶ 29–30; Doc. 12-3 ¶¶ 28–29; Doc. 15-5 ¶¶ 29–30; *see* Ex. B, Body Camera Footage at 00:15–00:22). On the body camera footage, it appears that Defendant crossed the ditch in front of Plaintiff's truck around the same time that Plaintiff got back into the truck and closed the door. (Ex. B, Body Camera Footage 00:21–0024).

The Parties dispute exactly what happened next; but there is no dispute that Plaintiff drove forward, passing Defendant on the left, and that Defendant fired twelve shots into the vehicle striking Plaintiff two times. (Doc. 12-1 ¶ 39; Doc. 15-5 ¶ 39; Ex. B, Body Camera Footage at 00:24–00:28). Based on a review of the body camera footage, Defendant stops shooting when the truck reaches the edge of the ditch and the front of the truck meets the road. (Ex. B, Body Camera Footage at 00:24–00:26). Thereafter, Plaintiff drove out of the ditch. (Doc. 12-8 at 95:3–5; *see* Ex. A, Dash Camera Footage at 28:58–30:00; *see* Ex. B, Body Camera Footage at 00:26–00:39). Eventually, Plaintiff pulled over. (Doc. 12-8 at 95:3–8; *see* Ex. A, Dash Camera Footage at 30:00–36:00; *see* Ex. B, Body Camera Footage at 00:39–7:11).

According to Plaintiff, he was trying to drive out of the ditch when he was shot.

3

(Doc. 12-8 at 82:13–84:15; Doc. 15-4 ¶¶ 7–8). Plaintiff claims that Defendant was fifteen to twenty-five feet to the left of the pickup truck when it passed him and that the pickup truck never veered in Defendant's direction. (Doc. 12-8 at 82:13–83:1, 85:19–86:10; Doc. 15-4 ¶¶ 9, 11). Plaintiff also claims that Defendant was never in the path of his truck. (Doc. 12-8 at 82:13–17, 82:23–83:1, 86:11–14; Doc. 15-5 ¶¶ 37–39). Plaintiff's expert concluded in his report that Defendant was "well out of the path of the truck when he started firing his weapon" and that all but one of the shots were fired from behind and perpendicular to the vehicle. (Doc. 15-1 at 16).

According to Defendant, as he crossed in front of the pickup truck, he heard the engine of the pickup truck revving and saw and heard its wheels spinning. (Doc. 12-1 ¶ 36; Doc. 12-3 ¶ 34; Doc. 15-5 ¶ 36). Defendant testified that he saw the truck moving towards him and that the truck's headlights were shining in his eyes. (Doc. 12-1 ¶¶ 36–37; Doc. 12-3 ¶ 34; Doc. 15-5 ¶¶ 36–37). Defendant, who had drawn his taser as he exited his patrol car, testified that he holstered his taser, drew his firearm, and began firing towards the pickup truck. (Doc. 12-1 ¶¶ 38–40; Doc. 12-3 ¶ 36; Doc. 12-7 at 53:5–11, 54:10–17; Doc. 15-5 ¶ 39; Ex. B, Body Camera Footage at 00:24–00:28). Defendant asserts that he believed that he would have been hit by the truck if he had not moved to the right to avoid it. (Doc. 12-1 ¶ 41; Doc. 12-3 ¶¶ 35–36; Doc. 12-7 at 91:14–17; Doc. 15-5 ¶ 41). Immediately after he stopped firing at the truck, Defendant reported to dispatch that he had discharged his firearm when "[Plaintiff] tried to run [him] over." (Doc. 12-1 ¶ 43 (first alteration in original); Doc. 15-5 ¶ 43).

Plaintiff suffered two gunshot wounds—one to his right arm and one to his right upper back at the base of his neck. (Doc. 15-4 ¶ 10; Doc. 12-5). Both gunshots were fired from the rear of the vehicle. (Doc. 15-4 ¶ 10; Doc. 12-5). The second bullet fragmented and caused a fractured spine, a fractured humerus, a pulmonary contusion, a fractured rib, and a fractured scapula. (Doc. 15-4 ¶ 10; Doc. 12-5).

## PROCEDURAL BACKGROUND

Plaintiff filed this action on September 23, 2022. (Doc. 1). Plaintiff's Complaint includes two counts. Count I asserts a 42 U.S.C. § 1983 claim alleging that Defendant

4

violated Plaintiff's rights under the Fourth Amendment of the Constitution by initiating the traffic stop without probable cause and for "using deadly force against [Plaintiff] under circumstances where it was objectively unreasonable to do so[.]" (*Id.* ¶¶ 23–27). Count II asserts state law claims for violations of the Georgia Constitution, battery, and negligence. (*Id.* ¶ 28–34). Plaintiff seeks general damages, special damages "for past and future medical expenses and past and future lost wages incurred as a direct consequence of the unconstitutional and tortious conduct of Defendant[,]" and attorney's fees. (*Id.* ¶¶ 35, 37). Defendant filed the Motion for Summary Judgment and Motion to Exclude Expert Testimony on November 6, 2023. (Docs. 12, 13). Plaintiff responded to the Motion for Summary Judgment on November 30, 2023, and the Motion to Exclude Expert Testimony on December 1, 2023. (Docs. 14–16; *see also* Docket). Defendant replied in support of his Motion for Summary Judgment on December 28, 2023, and replied in support of his Motion to Exclude Expert Testimony on December 29, 2023. (Docs. 17–20; *see also* Docket).

The Court held a hearing on December 11, 2024, on Defendant's Motion to Exclude (Doc. 13). (Doc. 26). At the hearing, after hearing the testimony of Plaintiff's expert, Mark Harmening, the Court found Harmening to be qualified, found Harmening's methodology to be sound, and found that his testimony would assist the trier of fact. (*Id.*). Accordingly, the Court denied the Motion to Exclude (Doc. 13). (Doc. 26). The Motion for Summary Judgment is ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law

which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the non-moving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs.*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the non-moving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). "The nonmovant is required to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## DISCUSSION

Defendant seeks summary judgment as to all of Plaintiff's claims. (Doc. 12).

## I. Federal Law Claims Under 42 U.S.C. § 1983

In Count I, Plaintiff asserts claims against Defendant in his individual capacity for two alleged Fourth Amendment violations: instigating the traffic stop without probable cause, which started the high-speed chase, and (2) using excessive force against Plaintiff at the conclusion of the chase. (Doc. 1 ¶¶ 23–27). In the Motion for Summary Judgment, Defendant asserts that qualified immunity bars Plaintiff's federal claims against him. (Doc. 12-2 at 6–15). "Qualified immunity protects government officers acting within their discretionary authority from liability for civil damages unless a plaintiff can show (1) that the officer violated a federal statutory or constitutional right, and (2) that the unlawfulness of the officer's conduct was clearly established at the time." *Wade v. Daniels*, 36 F.4th 1318, 1323 (11th Cir. 2022) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020)). A federal statutory or constitutional "right is clearly established if" (1) the U.S. Supreme Court, "the Eleventh Circuit, or the applicable state supreme court" has decided "a case with" "materially similar" facts; "(2) a broader, clearly established principle controls the facts of the situation; or (3) the conduct so obviously violates the constitution that prior case law is unnecessary." *Id.* (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). "The goal is to ensure that 'some established law' provided officers with 'fair warning' that their conduct was unconstitutional." *Id.* (quoting *Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019)). If issues of material fact exist, courts resolve them "in favor of the plaintiff." *Id.* (quoting *Alston v. Swarbrick*, 954 F.3d 1312, 1317–18 (11th Cir. 2020)).

To receive the benefit of qualified immunity, a government actor must first establish "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Sebastian*, 918 F.3d at 1307 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). If the official shows that he was acting within his discretionary authority, "the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th

Cir. 2009) (citation omitted). Plaintiff does not dispute that Defendant acted within his discretionary authority when he turned to follow Plaintiff and ultimately used deadly force against Plaintiff. (*See* Doc. 15 at 18). Thus, Plaintiff "bears the burden of proving that [Defendant is] not entitled to qualified immunity." *Williams*, 965 F.3d at 1156–57.

A court's assessment of whether the plaintiff has met his burden "is fluid" and may be done in whatever order is deemed most appropriate for the case. *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)); *see Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019) ("These two requirements may be analyzed in any order." (citation omitted)). "If the evidence at the summary judgment stage, construed in the light most favorable to the non-movant, contains 'facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial.'" *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021) (quoting *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020)), *cert. denied*, 142 S. Ct. 1112 (2022).

### A. Defendant's Decision to Initiate Stop

Plaintiff claims that Defendant violated his Fourth Amendment right to be free from unreasonable seizure when he initiated the traffic stop with no legal basis. (Doc. 1 ¶¶ 25–27; Doc. 15 at 14–17). Defendant argues that he is entitled qualified immunity as to this claim because he had "arguable" reasonable suspicion that a traffic violation had occurred at the point that he initiated the stop by turning on his emergency lights. (Doc. 12-2 at 8–9).

"An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is a foot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also Johnson v. Gibson*, No. 3:20-CV-64 (CDL), 2020 WL 7390329, at *2 (M.D. Ga. Dec. 16, 2020). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of

8

objective justification for making the stop." *Wardlow*, 528 U.S. at 123 (citing *United States v. Sokolow*, 490 U.S.1, 7 (1989)). "A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity[,]" and "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (citations omitted). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Thus, "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved." *Id.* "Even minor traffic violations[,]" like the one involved in this case, "qualify as criminal activity." *U.S. v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022).

Defendant began following Plaintiff because Defendant thought that Plaintiff's taillight was not functioning. (Doc. 12-1 ¶ 4; Doc. 12-7 at 22:7–18). Whether the light was functioning or not does not matter because Plaintiff's subsequent actions precipitated the traffic stop. By Plaintiff's own admission, he turned off all of the lights on the truck[2]—a clear violation of traffic laws—in an effort to avoid being stopped. (Doc. 12-1 ¶ 10; Doc. 15-5 ¶ 10; Doc. 12-8 at 49:11–50:10). After Plaintiff committed this obvious infraction, Defendant initiated the stop by turning on his emergency lights.[3] (Doc. 12-1 ¶ 10; Doc. 15-5 ¶ 10)[4]. Viewing the facts in the light most favorable to the Plaintiff, Defendant had at

---

[2]  Under O.C.G.A. §§ 40-8-20 and 40-8-23(d), drivers must turn on their vehicle's headlights "any time from a half-hour after sunset to a half-hour before sunrise" and must have taillights "wired as to be lighted whenever the headlights . . . are lighted."

[3]  Notably, "the Body[ Camera] video clearly shows that Plaintiff only had one [taillight]." (Doc. 19 at 6–7; Ex. A, Body Camera Footage, at 00:30–00:35). This is in violation of O.C.G.A. § 40-8-23(b), which states that "[e]very motor vehicle, trailer, semitrailer, and pole trailer manufactured after January 1, 1954, shall be equipped with two taillights which meet the specifications provided in this Code section." Thus, Plaintiff was observed committing two traffic violations before Defendant initiated the traffic stop.

[4]  In Defendant's statement of material fact numbers nine and ten, Defendant states that "[a]s [Defendant] got closer to the [p]ickup [t]ruck, all the lights on the [p]ickup [t]ruck went off" and "[w]hen the lights of the [p]ickup [t]ruck turned off, [Defendant] activated the emergency lights of the Patrol Vehicle." (Doc. 12-1 ¶¶ 9–10; Doc. 15-5 ¶¶ 9–10). These facts are undisputed as Plaintiff responds, "[n]ot controverted" to the facts asserted and cites to no specific citation in the record that would controvert the facts as asserted by Defendant. (Doc. 15-5 ¶¶ 9–10). In his deposition testimony, however, Plaintiff testified that he turned off the lights on his vehicle after Defendant activated the emergency lights, and

9

least an arguable reasonable suspicion to initiate the traffic stop. *See Wardlow*, 582 U.S. at 123.

Plaintiff's assertion that Defendant had a "vendetta against him" and recognized him from previous interactions does not signify. (Doc. 15 at 1; Doc. 15-4 ¶ 2). "[T]he constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813. Thus, even if Defendant had a vendetta against Plaintiff, looking at the facts in the light most favorable to the Plaintiff, Defendant had reasonable suspicion to believe that a traffic violation had occurred. (*See* Ex. A, Dash Camera Footage at 01:05–01:15). Accordingly, Defendant has qualified immunity in relation to the initiation of the traffic stop.

**B. Excessive Force**

Plaintiff also claims that Defendant used excessive force in violation of the Fourth Amendment when he fired into Plaintiff's truck. (Doc. 1 ¶ 24). Defendant argues that he is entitled to qualified immunity because Plaintiff presented a threat to public safety based on his reckless driving during the preceding chase and because he reasonably feared that Plaintiff was trying to run him over when he began to fire. (Doc. 12-2 at 6–15). "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citation omitted). "An officer's use of force, however, violates the Fourth Amendment when it is

---

responded "Yes, sir[,]" when asked to confirm that he had "no doubt in [his] mind that . . . [he] turned the headlights off because [Defendant] turned the blue lights on[.]" (Doc. 12-8 at 49:11–50:6). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason*, 24 F. Supp. 3d at 1260. Accordingly, the Court accepts that Defendant did not turn his emergency lights on until after Plaintiff turned off all of the lights on his vehicle. To the extent that Plaintiff contests that he turned off his lights before Defendant turned on his emergency lights, the Dash Camera Footage shows the lights on the pickup truck went out and the scene ahead of Defendant's vehicle went completely dark—aside from the occasional flash of the brake lights when Plaintiff approached a stop sign—for at least ten to thirty seconds before Defendant's emergency lights were illuminated. (Ex. A, Dash Camera Footage at 00:40–02:15).

10

*objectively unreasonable* under the facts and circumstances of a specific case, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017) (emphasis in original) (quoting *Graham*, 490 U.S. at 396); *Richmond v. Badia*, 47 F. 4th 1172, 1180–82 (11th Cir. 2022). "At summary judgment, [courts] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (citation omitted).

"Determining whether the force used to effect a[n arrest] was objectively reasonable requires case-by-case 'balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.'" *Stephens*, 852 F.3d at 1321 (quoting *Graham*, 490 U.S. at 396). To do this, courts evaluate six factors:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.

*Wade*, 36 F.4th at 1325 (citing *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam)). Furthermore, deadly force is reasonable under United States Supreme Court precedent when an officer

> (1) has probable cause to believe that a suspected felon poses a threat of serious physical harm to the officer or others; (2) reasonably believes that the deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Baxter v. Santiago-Miranda*, 121 F.4th 873, 888 (11th Cir. 2024) (citing *Tennessee v. Ganer*, 471 U.S. 1, 11–12 (1985)).

Although Defendant was only pursuing Plaintiff for a low level traffic offense, which would weigh against the use of deadly force, the Eleventh Circuit has consistently

11

"upheld an officer's use of deadly force in cases where the officer reasonably believed his life was endangered by a suspect who used or threatened to use his car as a weapon or where the officer reasonably believed the use of a vehicle presented an immediate threat of serious harm." *Id.* (first citing *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (holding that officers reasonably used deadly force when they cornered the plaintiff after a high speed chase and the plaintiff refused to get out of the car, kept the engine running, and started driving forward); and then citing *Robinson v. Arrugueta*, 415 F.3d 1252, 1255–56 (11th Cir. 2005); and then citing *McCullough v. Antolini*, 559 F.3d 1201, 1207–08 (11th Cir. 2009) (holding that officers reasonably used deadly force where after a high speed chase, the plaintiff "repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward [a] deputy standing nearby in a parking lot"); and then citing *Singletary v. Vargas*, 804 F.3d 1174, 1182–83 (11th Cir. 2015); and then citing *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1299 (11th Cir. 2021); and then citing *Davis v. Waller*, 44 F.4th 1305, 1314 (11th Cir 2022)). But, "where the plaintiff did not use or did not threaten to use his car as a weapon, [courts] reject[] an officer's use of deadly force." *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013). Defendant argues both that he was justified in using deadly force because Plaintiff presented an immediate public safety risk based on his reckless driving during the preceding chase and because Defendant reasonably believed he was in imminent danger of being run over by the truck when he began to fire his weapon. (Doc. 12-2 at 9–13).

      First considering whether Plaintiff presented a public safety risk as he sped away from Defendant, thus authorizing the use of force, Eleventh Circuit and United States Supreme Court precedent provide that, a "police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect *only* when the suspect poses an immediate threat of serious harm to the police officer or others." *Vaughan v. Cox*, 343 F.3d 1323, 1333 (11th Cir. 2003) (emphasis added) (citing *Garner*, 47 U.S. at 11). "A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott v. Harris*, 550 U.S. 372, 386 (2007). In

*Plumhoff v. Rickard*, the United States Supreme Court applied this rule to a case where an officer fired at a vehicle attempting to resume flight after crashing into a police vehicle and determined that the suspect's Fourth Amendment rights were not violated. 572 U.S. 765, 776 (2014). The Supreme Court noted that the driver's "outrageously reckless driving posed a grave public safety risk[,]" considering the fact that the plaintiff's vehicle exceeded 100 miles an hour and passed more than two dozen other vehicles during the chase. *Id.* Here, while Plaintiff's driving during the pursuit was reckless—reaching speeds of 99 miles per hour, running stop signs, and veering into the opposite lane—the chase took place late at night on a rural road on which only one vehicle other than Plaintiff's and Defendant's was present. (Doc. 12-1 ¶¶ 2–22; Doc. 12-3 ¶ 20; Doc. 12-8 at 47:21–25, 62:20–63:5; *see* Ex. A, Dash Camera Footage at 11:52–12:30, 15:00–29:25). Plaintiff's flight did not pose a risk to the public, and the use of deadly force is therefore unreasonable under clearly established law. *See Vaughan*, 343 F.3d at 1333 (denying qualified immunity because "[a]pplying *Garner* in a common-sense way, a reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on [the interstate] in the morning, would transform the risk of accident on the highway into a virtual certainty"); *see Harrell v. Campbell*, 482 F. Supp. 2d 1368, 1369, 1373 (N.D. Fla. 2007) (denying summary judgment to police officer who used deadly force where shooting occurred on a stretch of highway that was "deserted and rural" because Eleventh Circuit had denied qualified immunity in *Vaughan* where there was a greater risk to the public on a busier road). Accordingly, Defendant is not entitled to qualified immunity on this issue.

Next, consider whether Defendant is entitled to qualified immunity because he reasonably believed that he was in imminent danger of serious physical harm from Plaintiff's vehicle. (Doc. 12-2 at 9–11). Defendant relies on *Tillis* in arguing that he is entitled to qualified immunity for shooting into Plaintiff's vehicle. (*Id.* at 10–11 (citing *Tillis*, 12 F.4th at 1298)). In *Tillis*, following a highspeed chase that ended with a car crash, the pursuing officer got out of his vehicle and the suspect put his car in reverse. *Tillis*, 12 F.4th at 1295. In response, the officer fired into the vehicle. *Id.* The Eleventh Circuit upheld summary judgment in favor of the officer and explained that, "even if it were true that 'the

13

[suspect's car] could not possibly have swerved to hit [the officer]' based on its turning radius and its angle and distance to the officer, the relevant question is whether it was reasonable for [the officer] to fear otherwise the moment the [suspect's vehicle] began backing up." *Id.* at 1299. The court emphasized that an officer is not "*required* to be in the direct path of the moving vehicle to have a reasonable fear for his safety. It is enough that 'a reasonable officer would have reasonably believed that he was in imminent danger of being run over by [the suspect's] car." *Id.* at 1300 (emphasis and alteration in original) (citation omitted). Defendant argues that *Tillis* mandates summary judgment in this case because Defendant, who was also standing on foot near Plaintiff's vehicle as Plaintiff started driving out of the ditch, reasonably perceived that he was in imminent danger of being hit by Plaintiff's truck. (Doc. 12-2 at 10–11). Plaintiff argues that *Tillis* does not apply here because the plaintiff's expert in that case estimated that the officer was two feet away from the suspect's car when it passed him, whereas Plaintiff's expert in this case opines that Defendant was "well out of the path of the truck when he started firing his weapon" and all but one of the shots were fired from behind and perpendicular to the vehicle. (Doc. 15 at 11–14; Doc. 15-1 at 16); *see Tillis*, 12 F.4th at 1300.

     A genuine dispute of material fact exists as to whether a reasonable officer would have reasonably believed that his life was in danger in Defendant's position based on his proximity to the truck when he began to fire. *See Tillis*, 12 F.4th at 1300. Defendant and Plaintiff's narratives are diametrically opposed, and there is not sufficient evidence for the Court to resolve the dispute in Plaintiff's favor. *See Whitehead*, 979 F.3d at 1328 (explaining that on a motion for summary judgment, the district court resolves "[a]ny factual disputes . . . in the nonmoving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts"). According to Defendant, he was standing right in the path of the truck and would have been hit if he had not moved out of the way in time. (Doc. 12-3 ¶¶ 34–36; Doc. 12-7 at 91:14–17). According to Plaintiff, Defendant was fifteen to twenty feet away from the truck and the truck was moving away from Defendant towards the street. (Doc. 12-8 at 82:3–17, 82:23–83:1). It is clearly established in the Eleventh Circuit that that a defendant officer is not entitled to qualified

immunity when he fires at a suspect who is not using or threatening to use the vehicle as a weapon. *Morton*, 707 F.3d at 1283. Here, "there is a jury question as to the accuracy of [Plaintiff's version of events] . . . and, accepting [Plaintiff's] version as true" —that Defendant fired on Plaintiff's truck from twenty feet away while it was moving away from him—"the law was clearly established at the time the force [Defendant] used was constitutionally excessive." *Baysa v. Sheriff of Pinellas Cnty. Sheriff's Off.*, No. 21-13943, 2022 WL 2974110, at *3 (11th Cir. July 27, 2022) (per curiam). The Court, therefore, cannot find at this time that Defendant is protected by qualified immunity on this issue.

"This does not mean, of course, that [Defendant] will not ultimately be entitled to immunity." *Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (per curiam). "If a jury, for example through special interrogatories," indicates that it believes Defendant's version of the facts and finds that reasonable officer in Defendant's place would have believed his life was in danger when Plaintiff began to drive out of the ditch, "it will be appropriate for the . . . [C]ourt to revisit the issue whether [Defendant's] force was patently unreasonable." *See id.*; *see also id.* n.12 (noting that a "district court may grant qualified immunity following trial based on [a] jury's fact findings." (citing *Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir. 1992) (per curiam)). Construing the facts in the light most favorable to Plaintiff at this stage, however, qualified immunity does not apply to Plaintiff's excessive force claims and summary judgment is not appropriate.

## II.     State Law Claims

Plaintiff also asserts state law claims against Defendant for battery, negligence, and violations of the Georgia Constitution. (Doc. 1 ¶¶ 28–34). Defendant seeks summary judgment as to these claims because he argues that he is entitled to official immunity. (Doc. 12-2 at 15–17). Defendant also argues that Plaintiff's claims under the Georgia constitution are not viable. (*Id.* at 17–18).

### A. Official Immunity

Defendant argues that he is entitled to official immunity from Plaintiff's state tort and constitutional claims. (Doc. 12-2 at 15–18). "Under Georgia's constitution, official immunity 'protects an officer from personal liability arising from his performance of

15

"official functions" as long as the officer did not act with "actual malice" or "actual intent to cause injury."'" *Harris ex rel. Davis v. Autry*, No. 20-13480, 2022 WL 392169, at *4 (11th Cir. Feb. 9, 2022) (per curiam) (quoting *Gates v. Khokhar*, 884 F.3d 1290, 1304 (11th Cir. 2018)); *see also* Ga. Const. art. I, § 2, para. IX(d). Additionally, "official immunity protects officers 'who perform discretionary acts in a negligent manner.'" *Speight v. Griggs*, 579 F. App'x 757, 760 (11th Cir. 2014) (per curiam) (quoting *Logue v. Wright*, 392 S.E.3d 235, 237 (Ga. 1990)); *Williams v. DeKalb County*, 840 S.E.2d 423, 428 (Ga. 2020). "Even if Defendant was wrong in his assessment that deadly force was justified in this situation, this does not, by itself show that Defendant acted with actual malice." *Hart v. Logan*, 664 F. App'x 857, 864 (11th Cir. 2016) (per curiam). "Actual malice is the 'deliberate intention to do wrong.' Establishing actual malice to overcome official immunity is a high bar; it's 'not established merely by showing that the defendant acted with "ill will."'" *Harris*, 2022 WL 392169, at *5 (first quoting *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999); and then quoting *Gates*, 884 F.3d at 1304)). Furthermore, "the phrase 'actual intent to cause injury' as used in Georgia's official immunity provision—means 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* (quoting *Gates*, 884 F.3d at 1304). But, if the officer shoots the plaintiff "intentionally and without justification, then they acted solely with the tortious 'actual intent to cause injury.'" *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (quoting *Gardner v. Rogers*, 480 S.E.2d 127 (Ga. Ct. App. 1996)).

As discussed above, Plaintiff does not dispute that an officer's use of force is a discretionary function of an officer rather than a ministerial one. (Doc. 15 at 18). Thus, the Court must determine whether there is a genuine dispute of material fact regarding whether Defendant Weston acted with actual malice or actual intent to cause injury when he fired twelve shots at Plaintiff's vehicle. *Harris*, 2022 WL 392169, at *5. Defendant testified at his deposition that, when he fired his weapon, he believed that Plaintiff's vehicle was driving directly in the path that he was standing in, that Plaintiff was trying to run him over, and that his life was in danger. (Doc. 12-3 ¶ 35; Doc. 12-7 at 54:13– 55:1, 56:3–14, 90:18–

16

91:25). Plaintiff, on the other hand, testified that he was trying to get his vehicle out of the ditch and back on the road. (Doc. 12-8 at 80:24–81:17, 82:13–86:14). Plaintiff's expert explained in his report that Defendant was "well out of the path" of Plaintiff's truck when it passed him and that all but one of the shots were fired from perpendicular to or behind the truck as it drove away. (Doc. 15-1 at 16). If a jury found that Defendant was well out of the path of Plaintiff's truck when it passed him, that there were no others present that were endangered by Plaintiff's flight, and that Defendant simply shot at the vehicle to stop Plaintiff from fleeing or out of frustration that Plaintiff was getting away, then Defendant's actions would be intentional and unjustifiable, demonstrating an actual intent to cause injury. *Kidd*, 518 S.E.2d at 125. But if a jury found that Defendant acted in self-defense because he reasonably feared that Plaintiff was trying to run him over, then his actions would be justified under Georgia law; and he would be entitled to official immunity. *Id.* As stated above, there is not sufficient evidence to support resolving the factual dispute in Plaintiff's favor. *See Whitehead*, 979 F.3d at 1328. Thus, a genuine dispute of fact remains regarding whether Defendant was acting in self-defense, and Defendant is not entitled to judgment as a matter of law that he is protected by official immunity.

### B. Claims Under the Georgia Constitution

In Count II of the Complaint, Plaintiff alleges that Defendant violated his rights under Article I, Section 1, Paragraph XIII and Paragraph XVII of the Georgia Constitution. (Doc. 1 ¶¶ 28–34). Article I, Section 1, Paragraph XIII, like the Fourth Amendment to the U.S. Constitution, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.]" Ga. Const. art. I, § 1, para. 13. Article I, Section 1, Paragraph XVII protects a person from "be[ing] abused in being arrested, while under arrest, or in prison." Ga. Const. art. I, § 1, para. 17. As with all of Plaintiff's claims, the state constitutional claims are asserted against Defendant in his individual capacity. Defendant seeks summary judgment as to Plaintiff's claims under the Georgia Constitution because Georgia law provides no right of action for violations of the Georgia Constitution. (Doc. 12-2 at 17–18).

"Georgia has 'no equivalent to 42 USC § 1983, which gives a claim against a state

officer individually for certain unconstitutional acts.'" *Davis v. Standifer*, 621 S.E.2d 852, 855 n.2 (Ga. Ct. App. 2005) (quoting *Howard v. Miller*, 476 S.E.2d 636, 639 (Ga. Ct. App. 1996). Plaintiff's claims under the Georgia Constitution thus fail as a matter of law and Defendant is entitled to summary judgment. *See Dixon v. Ga. Dep't of Pub. Safety*, 135 F. Supp. 3d 1362, 1372 (S.D. Ga. 2015) (dismissing state constitutional claims against defendant in his individual capacity); *O'Dom v. Hudgens*, No. 1:26-CV-3911-TWT, 2017 WL 3769329, at *3 (N.D. Ga. Aug. 31, 2017) (same).

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 12) is **GRANTED in part** and **DENIED in part.** Plaintiff's Fourth Amendment claim stemming from Defendant's decision to stop Plaintiff in Count I and Plaintiff's claim under the Georgia Constitution in Count II are **dismissed with prejudice**.

**SO ORDERED**, this 31st day of March, 2025.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**